John Wilson **DICKSON**, Movant-Appellant,

v.

**STATE** of Missouri, Respondent.

No. 54369.

Supreme Court of Missouri, Division No. 2.

Jan. 12, 1970.

---

Robert S. Kilker, Wiliam C. Maier, J. Dennis O'Leary, St. Louis, for appellant.

John C. Danforth, Atty. Gen., Peter H. Ruger, Asst. Atty. Gen., Jefferson City, for respondent.

BARRETT, Commissioner.

■ On March 8, 1966, John Wilson Dickson entered pleas of guilty to two charges of murder in the second degree and one charge of assault with malice with intent to rob and was sentenced to concurrent terms of imprisonment of fifteen years in the murder cases and ten years in the assault case. On December 15, 1967, he instituted this proceeding under rule 27.26,

V.A.M.R., to vacate the sentences, he was given a full and complete hearing on his motion, he was represented by diligent court-appointed counsel, the court found all issues against him and he has appealed. While the appellant has employed the form set forth in the rule, in defiance of the rule's spirit and purpose he has set forth a multitude of irrelevant matters and allegations which his counsel should have eliminated by amendment and the defendant not agreeing the court may· have been well advised to either dismiss or refuse to· hear the matter until there was compliance with the rule. In this category are the flip and misplaced invocations of Magna Carta, the Assize of Clarendon and Coke's Institutes as well as the references to the founding fathers, John Rutledge and George Mason. Out of this disordered maze of allegations his counsel have ·briefed, argued and asserted· five points which they say entitle him to be discharged or to a new trial.

■ The original *indictment* in one of the murder cases, to illustrate, is a conventional charge of murder in the first degree "by any other kind of willful, deliberate and premeditated killing," there is no reference in the indictment to one of the other types of first degree murder, a homicide committed in an "attempt to perpetrate any * * * robbery." RSMo 1959, § 559.010, V.A.M.S. Again by way of illustration, one of the murder indictments charges that on December 31, 1965, Joseph Price, Melvin Collins, Donald Collins and John Wilson Dickson "feloniously, willfully, premeditatedly, deliberately, on purpose, and of their malice aforethought did make an assault upon one Pete Valenti with a loaded pistol, and then and there, feloniously, willfully, premeditatedly, deliberately, on purpose, and of their malice aforethought did discharge said pistol at and upon the body of the said Pete Valenti thereby feloniously inflicting a mortal wound upon the said Pete Valenti from which said mortal wound Pete Valenti did die." While the conventional indictment for murder in the first

degree would admit of proof and sustain a conviction of murder in an attempt to commit a robbery it does not in terms allege a robbery nor was it necessary to do so even if the fact was of a homicide in an attempt to rob. State v. Foster, 136 Mo. 653, 38 S.W. 721; State v. Peak, 292 Mo. 249, 237 S.W. 466; State v. Adams, 316 Mo. 157, 289 S.W. 948; State v. King, 342 Mo. 1067, 119 S.W.2d 322 and State v. Bradley, Mo., 234 S.W.2d 556. Only in the indictment for the assault on Mrs. McBride was there any mention of an attempt to rob. There it was charged that Price, the Collins brothers and their first cousin, Dickson, "did make an assault on Hazel McBride with a pistol with the intent to rob said Hazel" but in the execution of the intent did fail.

When called on June 12, 1967, after noting all appearances, the cases were taken up separately, one by one in detail, and Dickson's counsel, again to illustrate, announced that defendant would withdraw his previously entered plea of not guilty and would enter a plea of guilty. An assistant circuit attorney interposed and said "the state will *reduce* the charge to Murder, Second Degree." Whereupon, in each case, the state's attorney briefly recited the facts of the two murders and the attempt to rob and for the first time it was revealed that the killing of the Valenti brothers and the assault on Mrs. McBride resulted when the four defendants attempted an armed robbery of the Fairlane Market at 2812 North Vandeventer Avenue. After the state's announcement that it would "reduce" the charge from first to second degree murder the court in addressing defendant's counsel said, "You are withdrawing his former plea of not guilty and entering a plea of guilty to the *amended* charge of Murder, Second Degree?" These were the only references, by the state's attorney "reduce" and by the court "amended," concerning the two murder indictments. The state did not, as it could have, substitute informations for the indictments (Criminal Rule 24.02) and by eliminating the words of art charge the appellant and his confed-

erates with murder in the second degree under § 559.020, RSMo 1959, V.A.M.S. There was in fact no amendment or any attempt, to use the language of the court, to "amend" the indictment. And other than the state's attorney's statement in the record that the state would "reduce" the charge, there was in point of fact no court minute or clerk's entry, the defendant Dickson simply entered a plea of guilty and after the state's attorney's statement of the facts as to the substantive offense the court, in each case, personally addressed the defendant: "Mr. Dickson, first of all, let me ask you whether the withdrawal of the former plea of not guilty, made by Mr. Cleary, your attorney, and the plea of guilty to the *amended* charge of Murder, Second Degree, was with your consent? Mr. Dickson: Yes, sir."

In these circumstances appellant's counsel argues not that the indictments charge but that "the facts show" (as stated by the circuit attorney) that the homicides for which Dickson was indicted occurred in the course of an attempted robbery and therefore it is said that the indictments charging murder in the first degree could not be amended, reduced or otherwise changed to murder in the second degree. In effect counsel says that in the circumstance of a killing in an attempt at robbery the defendant must be found guilty of murder in the first degree only and sentenced either to life imprisonment or death or acquitted. It is said that an indictment, unlike an information (Criminal Rule 24.02; RSMo 1959, §§ 543.040, 545.300, V.A.M.S.), cannot in any circumstance be amended, that the state "made a void attempt to amend the charge" and therefore the court in accepting a plea of guilty and sentencing for second degree murder exceeded its jurisdiction and the "sentences entered are void as a matter of law" with the consequence that Dickson is entitled to be discharged of the two murder convictions.

■ But the disposition of this appeal does not require a determination of the

problem of whether in Missouri an indictment may be amended. See, however, the annotation 17 A.L.R.3d 1181 and State v. Holbert, Mo.App., 399 S.W.2d 142. Here there was no jury trial, this is a collateral proceeding, and the appeal does not pose the question of whether the proof showing a homicide in an attempted robbery second degree murder could be submitted or in that circumstance whether the jury was compelled to return only one of two possible verdicts, a conviction of first degree murder or an acquittal. State v. Conway, 351 Mo. 126, 171 S.W.2d 677; State v. Hamilton, 337 Mo. 460, 85 S.W.2d 35; State v. Yeager, Mo., 12 S.W.2d 30; State v. Bradley, 361 Mo. 267, 234 S.W.2d 556. The fallacy in the appellant's entire argument is that it ignores these factors: Whatever the facts of the killings, the indictments charge, as stated, the conventional crimes of murder in the first degree which necessarily "includes the lesser offense of murder in the second degree." State v. Heath, 221 Mo. 565, 121 S.W. 149; State v. Malone, Mo., 382 S.W.2d 679; State v. Wallach, Mo., 389 S.W.2d 7; State v. Smith, Mo., 411 S.W.2d 89. In that connection, because "murder in the first degree under our statute every grade and every degree of criminal homicide from the highest to the lowest is embraced" (and) "the legal representative of the government may declare that he will no further prosecute the particular indictment or some designated part thereof, and this *nolle prosequi* may well go to the whole of an indictment, to one or more of its counts, or even to a separable part of any one count." And so when the prosecutor was "allowed to exercise the right of election to prosecute the defendant for murder in the second degree" the court said that his action "was simply to enter a *nolle* as to separable parts of each of the counts of the indictments, thereby eliminating therefrom the counts charging murder in the first degree." State v. Moxley, 115 Mo. 644, 651, 22 S.W. 575, 577; State v. Peeden, 272 N.C. 494, 158 S.E.2d 615. Ohio statutes permit the amendment of indictments but in a habeas corpus proceeding,

a defendant seeking release from the penitentiary on the ground that he had entered a plea of guilty to an offense with which he was not charged, murder in the second degree, the indictment charging a murder "in the perpetration of a robbery," the court held that he could nevertheless be convicted of the lesser included offense. Craft v. Alvis, Ohio App., 140 N.E.2d 61. In Louisiana, upon a charge of murder, the state before proceeding with the trial "abandoned the charge of murder and elected to go to trial only on the charge of manslaughter." Upon objection to the latter submission the court said, "In such cases the state may abandon the charge of the greater crime and proceed with the prosecution of the lesser, and no formal amendment of the indictment is necessary for that purpose. A motion in open court in the presence of the accused and entered on the minutes prior to the beginning of the trial is sufficient." State v. Doucet, 177 La. 63, 66, 147 So. 500, 501, 87 A.L.R. 1356. And in this case, there were no objections whatever to either the procedure followed in accepting the pleas or in reducing the charges. There was in fact no physical amendment of the indictments, either by interlineation or otherwise, and no substitution of informations and whatever terminology one may apply, "abandonment" as in the Ohio and Louisiana cases, or a "nolle prosequi" as in the Missouri case, the charge was "reduced" by the state to second degree murder, all with the express assent of the defendant, and in the circumstances there could be no possible prejudice to the appellant (State v. Wallach, Mo., 389 S.W.2d 7), certainly no denial of due process (State v. Hoyt, 324 Mo. 837, 24 S.W.2d 981) and indeed no valid basis for relief in this belated collateral proceeding.

■ This view, particularly since the three sentences are concurrent, (State v. Macon, Mo., 403 S.W.2d 630) necessarily disposes of the appellant's second point that the sentence of ten years on the assault with intent to rob indictment should

be set aside to "correct manifest injustice" under rule 27.25. This plea is made despite the fact that there was no objection whatever to the assault indictment and there is no attack on it here. In their brief appellant's counsel invoke rule 27.25 and its "manifest injustice" provision upon the assertion that the three sentences were "part of a deal," or "as a part of the package deal." In response it may only be said that if there was any sort of a "deal," and none appears from the record, the state kept and performed its part of any agreement to the letter and there was not the slightest injustice in the court's refusing to set aside Dickson's solemn plea of guilty to a charge which even he does not attack.

Appellant briefs and argues three other points in this appeal from a post-conviction proceeding (it should be kept in mind). He insists that he was denied a speedy trial in that his cases were not heard before the expiration of the second term (RSMo 1959, § 545.890, V.A.M.S.), instead they were not disposed of until the expiration of the eighth term, seventeen months after indictment. He does not specifically urge the fact but inferentially he must be asserting an infringement of his constitutional right to "a speedy public trial." Const.Mo.1945 Art. I, § 18(a), V.A.M.S. A second point is that his pleas of guilty were not voluntary in that he was coerced into pleading guilty "to escape the inhumane conditions of the city jail (and) because of his inability to have his case taken to trial." Both of these points and pleas are related to if not dependent on his successful assertion of the remaining claim that he was "denied the effective assistance of counsel in that the record shows that the state could not have made a case against appellant and that counsel, knowing this, failed to take the case to trial." And throughout the brief, the competency of appellant's court-appointed counsel is vigorously if not scathingly attacked in numerous respects. Except for the chance imputation of judicial pique and irritation ("The Preservation of Personality," Judge Learned Hand in The Spirit of Liberty, p. 43), these latter points could be disposed of summarily and without demonstration upon the transcript by reason of sheer factitiousness and lack of foundation in the record.

The three indictments charging the four defendants with the two killings and the attempted robbery were filed on February 17, 1966. On arraignment, Joseph Noskay, Director of the Public Defender Bureau, represented Dickson and pleas of not guilty were entered in each of the cases. It does not appear when or how Mr. Noskay came to represent Dickson or that he was ever formally relieved as his lawyer. On March 8, 1966, the court appointed Mr. Francis X. Cleary and Mr. Daniel T. Rabbitt, Jr., to represent Dickson in all three cases. Mr. Orville Richardson was appointed and represented Melvin Collins in all three charges, and Mr. Mortimer Rosecan, Mr. John R. Dixon and Mr. Robert Evans were appointed and represented Donald Collins and Joseph Price. Melvin Collins, represented by Mr. Richardson, was first tried in one of the murder cases, that trial resulted in a mistrial and eventually the Collins brothers and Price all entered pleas of guilty in the three cases. Melvin and Donald Collins were given life sentences in the murder cases and terms of years in the assault case and Price was sentenced to life in the murder cases and a term of years in the assault case.

It is not necessary to relate all the steps, Mr. Cleary and Mr. Rabbitt first moved for and secured a severance for Dickson. When Dickson entered his pleas of guilty on June 12, 1967, the court, as stated, insisted that the cases be taken up "separately." And in each case, after the entry of the pleas, the court asked the state's attorney "to give the court some facts" as to each charge and he admonished "that while he is doing so, you listen to him, Mr. Dickson." And each time state's counsel stated that on "New Year's Eve" 1965 "the two Collins brothers and Price and this man entered" the Fairlane Market

and in an attempt to rob the cashier, Hazel McBride, "shooting broke out, and there was an exchange of fire between the two subsequent victims, namely, Tony Valenti and Peter Valenti, and in which defendant Price who shot three times." One of the four robbers caried a sawed-off shotgun, two of them had pistols and it was from these that ballistics witnesses could say which gun had killed each of the Valentis. Dickson was "unarmed" and "was not identified by any of the witnesses in that store." His present counsel point to these two circumstances and from them argue that competent counsel would have known that a case could not be made against him. However, as Mr. Rabbitt said, in part, in answer to the question "What, in your opinion, was the state going to use to make a case against John Wilson Dickson?" "* * * there was evidence that we were able to determine that would bring John to the place and take him away from the place driving a car. There was testimony * * * of plotting the thing" by McNicholas "and others." And the state's attorney, after stating that defendant had no weapon, said "There is evidence that he went into the store to make a purchase of bread or something, and as he went in, in the company of these other men, that he had no weapon nor did he do any shooting." Then, unless set aside as involuntary in all three cases, there are of course the appellant's pleas of guilty—solemn confessions in each case. All this is aside from the written confessions Dickson and all the others gave because at the instance of Mr. Richardson, at least Melvin Collins' confession was suppressed. Mr. Cleary and Mr. Rabbitt filed similar motions on behalf of Dickson but because they did not pursue the matter to the bitter end this is now one of the charges of incompetent counsel, despite Mr. Cleary's explanation: "and then we heard the other motion tried on voir dire, the Collins case, and his followed the same pattern, and we were convinced that our motion to quash his confession was going to be sustained, and his confession was not

going to be permitted in the trial. We had no qualms about that, because we were certain the Court was going to agree with us, because he wasn't advised of some of his rights under the Supreme Court decision." As to how the state was going to make a case Mr. Cleary conceded that the state had not "told us what their evidence was going to be" but, he said, "We had satisfied ourselves to that extent, that they could make a case against Mr. Dickson, and that's what we were concerned with." In any event if it is an open question upon this appeal in this proceeding it may be said in passing that the circumstances detailed by the state's attorney were sufficient to sustain a finding of Dickson's connection with the attempt to rob and his guilt of all three offenses. "The defendant's connection with the crime was through his association with the other men in the attempt to rob the bank, in which attempt the murder was committed. It was murder in the first degree if he was there with the others engaged in that enterprise" even though there was no proof of a conspiracy or that he fired a shot. State v. Hart, 292 Mo. 74, 100, 237 S.W. 473, 482; State v. Hamilton, 337 Mo. 460, 85 S.W.2d 35; State v. Boesel, Mo., 64 S.W.2d 243; State v. Chernick, Mo., 278 S.W.2d 741.

And now to return to the circumstances in which Dickson's pleas of guilty were entered in June 1967, after the circuit attorney's brief résumé of the facts and in each case as it was called, the court personally addressed the defendant. The court, to excerpt and illustrate, "Mr. Dickson, first of all, let me ask you whether the withdrawal of the former plea of not guilty, made by Mr. Cleary, your attorney, and the plea of guilty to the amended charge of Murder, Second Degree, was with your consent? MR. DICKSON: Yes, sir. THE COURT: Now, are the facts just stated to me by Mr. Walsh, the Assistant Circuit Attorney, substantially correct? MR. DICKSON: Yes, sir. THE COURT: They are? MR. DICK-

SON: Yes, sir. * * * THE COURT: Have you been satisfied with the services rendered by these two men? MR. DICKSON: Yes, sir. THE COURT: I don't know whether you are aware of the fact that Mr. Cleary is one of the most outstanding attorneys in this area; in this state, in fact. Are you familiar with that? MR. DICKSON: Yes, sir. * * * THE COURT: Now, the Court must know whether you have discussed with your attorneys the consequences, the results, or the effect of a plea of guilty; have you discussed with your attorneys that pleading guilty, in effect, is an admission of guilt? MR. DICKSON: Yes, sir. THE COURT: You understand that? MR. DICKSON: Yes, sir. THE COURT: The consequence of a plea is an admission of guilt on your part to this charge. MR. DICKSON: Yes, sir. THE COURT: Now, you understand then, what you are doing? MR. DICKSON: Yes, sir. THE COURT: Is this plea of guilty on your part, then, voluntary on your part? MR. DICKSON: Yes, sir." And on the proceeding went the court again advising the appellant of his right to a jury trial and that a plea of guilty was a waiver of that right. The defendant said that he had talked to his wife, his mother and others about pleading guilty. And incidentally, on the occasion of his plea ten members of his family were present.

Before the sentences were pronounced Mr. Cleary made a plea for the allowance of seventeen months' jail time on the sentences. The court reflected on the matter, mentioned the psychiatric examination on his counsel's motion as well as other matters and finally allowed ten months' jail time on the sentences. In connection with the penalty to be assessed the court did not take into consideration the fact of Dickson's prior conviction of another robbery in 1954. And on the trial of this proceeding Dickson was reminded of all these questions and answers, and replied only "I can't recall everything that was said."

In addition to the severance, by appellant's own statement Mr. Cleary personally saw him and conferred with him at the city jail four or five times and Mr. Rabbitt twelve or thirteen times. Mr. Cleary also conferred with his wife. Mr. Cleary and Mr. Rabbitt took depositions, attended the deposition taking in the Collins cases and attended the Collins trial—all in preparation of defending and trying Dickson's case. Despite appellant's denials all of the continuances were made on his behalf or with his assent because as Mr. Cleary said: "We didn't do anything he didn't authorize us to do; I can say that, sir, because we were very careful in handling this matter because we knew the complexities that could arise from handling this. We were all very cautious in getting consent to do everything." It was on his counsel's motion that appellant was given a three months' psychiatric examination at the Fulton State Hospital. Also as Mr. Cleary explained, in part the reason for the continuances, "We wanted the benefit of that trial, to see how strong a case the State would present, and we had no hesitancy in recommending to him to see how the the other gentleman fared; one of the Collinses went to trial at that time." And speaking for himself as well as Mr. Rabbitt, Mr. Cleary said "he was thoroughly aware of the procedure we were going to follow." As to their desires in general Mr. Cleary said that their conduct and procedure was directed to "Anything that would help us put up a defense for this man to show that he was not guilty. We would accept anything that was legitimate and legal proof. We were looking for anything that would help Mr. Dickson. We wanted to help him. We wanted to free him of this charge and show he wasn't guilty. That's the reason we took depositions. We wanted to do everything we could to help him. That was the only interest we had." As to the amount of time devoted to defendant's cases, he said "a voluminous amount of time, Dan Rabbitt and I. Dan Rabbitt more than I." In the 27.26 hearing ap-

pellant's present counsel challenged Mr. Cleary's ability to try a criminal case, especially in view of forty years' experience largely devoted to civil practice and he said, "No, I can't see any difference. You are telling the jury facts based on whatever people say or your documents prove, and there is no difference when you get down to the jury level in presenting a case before a jury." When present counsel intimated that he may not have been anxious to try one of the cases this was the response: "We advised him we would do what he wanted. We wanted him to tell us what he wanted. Q. Did you tell him that you were willing to try the case before a jury? A. You bet your life, there was no question about that. Q. Did you tell him throughout the time you dealt with him? A. Oh, I don't think I made a broken record of this and kept repeating it and repeating it. I was somewhat disappointed that we didn't try it, actually. I wanted to try it in June, we thought his chances were much better than before a jury."

■ The attribution of incompetent or ineffective counsel will come as a surprise to the bar at large and is perhaps a bit of a shock to these six renowned trial lawyers—all with more than state-wide reputations. On this score and as applied to this particular case the court made a detailed finding of fact and, needless to say, that finding as well as the finding that Mr. Cleary and Mr. Rabbitt informed their client of every step, every procedure and every hazard and that finally his was the choice to plead guilty to two murders committed in a clumsy attempt at robbery are all supported. Holt v. State, Mo., 433 S.W.2d 265. By the same token the charge of denial of a speedy trial is refuted by the record and the court's finding to the contrary supported—particularly in view of the court's considerate allowance of ten months' jail time—the only request made on this score. State v. Thompson,

Mo., 414 S.W.2d 261; State v. Barrett, Mo., 406 S.W.2d 602; State v. Harris, Mo., 425 S.W.2d 148; Osborne v. Owsley, Mo.App., 257 S.W.2d 691. And the assignment that his pleas of guilty were induced by reason of the necessity to escape the harsh conditions of the city jail are without the slightest foundation: "Dissatisfaction with a penal condition, brought about by one's own conduct, and a hope that by a guilty plea a different kind of incarceration might be achieved are scarcely factors of involuntariness in a plea." Verdon v. United States, 8 Cir., 296 F.2d 549. It would serve no useful purpose to further demonstrate point by point upon the record, the pleas of guilty were all entered voluntarily and with understanding as the court found when they were entered on March 8, 1966 (Drew v. State, Mo., 436 S.W.2d 727), and not only are the courts' findings all supported within the requirements of criminal rule 27.26 (Crosswhite v. State, Mo., 426 S.W.2d 67), there is indeed no "manifest injustice" in the court's refusal to permit withdrawal of the pleas under criminal rule 27.25. Despite the length of this opinion, this proceeding is another of a large and increasing number of instances of the depths to which post-conviction remedies have been degraded. In short, this is all but a frivolous appeal in a proceeding in circumstances not within the contemplation and spirit of the post-conviction remedies.

For the indicated reasons the judgment is affirmed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.